UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SCOTT RICHARD HANSON,<br><br>    Plaintiffs,<br><br>    v.<br><br>JOHANNA SMITH, DR. SCOTT DAVID LOSSMAN; DR. APRIL CHARLENE DAWSON; DR. MYUNG AE SONG DO; MS. RONA SIEGERT; JOHN and JANE DOES, One through Ten; CORRECTIONAL MEDICAL SERVICES; and CORIZON MEDICAL SERVICES,<br><br>    Defendants. | Case No. 1:11-cv-00525-BLW<br><br>MEMORANDUM DECISION AND ORDER |

    Before the Court is a Motion for Summary Judgment filed by Defendants Scott Lossman, M.D., April Lawson, M.D., and Myung Song, D.O. (collectively, the "Corizon Defendants"). (Dkt. 47). Additionally, defendant Rona Siegert has filed a Motion for Summary Judgment (Dkt. 53). Siegert and the Corizon Defendants are the only remaining defendants in this action. Plaintiff Scott Hanson has not opposed either motion. For the reasons explained below, the Court will grant both motions.

**ORDER - 1**

# FACTS[1]

Plaintiff Scott Hanson is an inmate in the custody of the Idaho Department of Corrections. Relevant to this action, he was incarcerated in IDOC facilities for around four months in 2009 (April 2, 2009 and August 11, 2009). He was released in August 2009, but reentered prison in February 2010. Upon reentry, Hanson was housed in IDOC facilities in Kuna, Idaho (ISCI and SICI). He remained in one of these two facilities until February 7, 2012, when he was transferred to a private prison.

## A. Hanson's Medical Care Leading to Surgery

Hanson complains that he received constitutionally deficient care in the diagnosis and treatment of his prostate cancer. He says he began experiencing difficulty urinating "as far back as 2009 . . . ." *Compl.*, Dkt. 3, ¶ 16. He was prescribed medications, *id.*, but his prostate-specific antigens (PSA) levels registered as "normal" as of April 2009. *Siegert Aff.*, Dkt. 53-4, ¶ 6.

Shortly after he reentered prison in February 2010, Hanson's medical condition was again assessed. Based on his complaint of urinary difficulties, a physician's assistant

---

[1] The facts reported in this section are drawn from defendants' statements of undisputed facts. *See* Dkts.47-2, 53-1. Hanson did not oppose the pending motions for summary judgment, and thus has not refuted or otherwise addressed these factual statements. The Court thus considers all facts set forth in these statements as undisputed for purposes of ruling on the pending motions. *See* Fed. R. Civ. P. 56(e)(2) ("[i]f a party fails to . . . properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion"); *Heinemann v. Satterberg,* 731 F.3d 914, 917 (9th Cir. 2013). Further, after independently reviewing the record, the Court is satisfied that the factual assertions made in these statements are properly supported.

ordered that Hanson's prostate-specific antigens (PSA) be checked again. The test results showed elevated PSA levels, which resulted in a medication order (Flomax) as well as an order that Hanson's PSA levels be rechecked in June 2010.

Hanson's PSA levels were retested on July 8, 2010, and again showed elevated levels. Roughly three weeks later, on July 30, 2010, Hanson was taken to an offsite urologist, Dr. William Fredriksson, for a consultation. At this consultation, Dr. Fredriksson recommended an ultrasound and a biopsy. He performed those procedures on September 3, 2010 and recommended a follow-up visit to go over the biopsy results. *See Sept. 3, 2010 Consultation Report,* Dkt. 47-10 at ISCI 210.

Dr. Dawson reviewed the biopsy report with Hanson on September 14, 2010, and immediately arranged for an October 8, 2010 follow-up visit with Dr. Fredriksson. During this visit, Dr. Fredriksson spent 45 minutes discussing treatment options with Hanson, including surgery, radiation, chemotherapy, and "watchful waiting." *Oct. 8, 2010 Progress Note,* Dkt. 47-10 at ISCI 206. Dr. Fredriksson suggested that Hanson "take time to make an informed decision about his treatment . . . ." and further recommended that Hanson see two other specialists – Dr. Tim Sawyer, who is a radiation oncologist, and Dr. Helen Kuo, a urologist who performs robotic prostatectomies. *Id.*

Hanson saw Dr. Sawyer and Dr. Kuo on November 18, 2010. Dr. Kuo advised that most prostate cancers are slow-growing and that Hanson's cancer was "likely organ-confined." *See Defendants' Statement of Undisputed Facts ("SOF"),* Dkt. 47-2 ¶ 9; *Dawson Aff.* ¶ 20. She recommended that Hanson decide on his treatment option within

the next several weeks. Dr. Sawyer, on the other hand, believed surgery was an excellent option and advised against watchful waiting. Dr. Sawyer further observed that Hanson was taking some time to consider his options, and that Hanson wished to get his sister's input before selecting a treatment.

On December 7, 2010, Dr. Dawson met with Hanson to discuss his treatment options. *SOF* ¶ 10. At that time, Hanson said he had decided on having surgery. On January 4, 2011, Hanson had a surgical evaluation with Dr. Waldmann, of the Idaho Urologic Institute, who recommended a prostatectomy. Dr. Dawson thus requested a surgery consultation, and Hanson had surgery on January 31, 2011.

### C. Post-Surgery Medical Care

After surgery, Hanson was discharged in good condition, with orders of pain medication and a bottom bunk memo. Following surgery, Hanson at times experienced urinary difficulties, including nocturia (urinating at night), dribbling, decreased stream, and pain. The uncontroverted facts show that his medical care providers consistently responded to these complaints. Among other things, Hanson received infirmary care, pain medications, multiple assessments by different providers, including two follow-up visits with his surgeon, Dr. Waldmann, and prescriptions to help penile function return: Cialis and use of a vacuum erection pump (a penis pump).

## GOVERNING LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the question on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id*.

The moving party bears the initial burden of demonstrating the absence of a

genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R. Civ. P. 56(e). In determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary

judgment even if the evidence itself is hearsay. *Id*. (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

## ANALYSIS

**1. Hanson's Eighth Amendment Claim**

Inmates rely on prison authorities to treat their medical needs. The government therefore has an obligation to provide medical care for those whom it is punishing by incarceration. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Deliberate indifference to serious medical needs of prisoners violates the Eighth Amendment. *Id.* at 104.

**A. The Governing Legal Standard**

This deliberate-indifference standard includes an objective element and a subjective element. *See Snow v. McDaniel,* 681 F.3d 978, 982 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir.2014) (en banc). To oversimplify somewhat, the objective element deals with the prisoner's medical needs, while the subjective element deals with the defendants' response to those needs.

To satisfy the objective element, plaintiff must demonstrate the existence of a "serious medical need." *Estelle*, 429 U.S. at 104. Such a need exists if the failure to treat the injury or condition "could result in further significant injury" or cause "the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotes and citations omitted). Serious medical needs include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy

of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; [and] the existence of chronic and substantial pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir.1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997).

Under the subjective element, a prison official is deliberately indifferent only if the official "knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal quotes and citation omitted). To prevail on a claim for deliberate indifference, a prisoner must demonstrate that the prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825 (1994). Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir.1988).

In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir.1980) (citing *Estelle*, 429 U.S. at 105-06.) A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of

medical mistreatment under the Eighth Amendment. Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. *See Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir.1990). Also, "a difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a[§ ] 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir.1981). To establish that such a difference of opinion amounted to deliberate indifference, the prisoner "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

### B. The Corizon Defendants

Hanson's Eighth Amendment claim is generally based on his contention that defendants delayed treatment in order to save money. But when the undisputed facts are viewed in the light most favorable to Hanson, there is no room for a rational juror to conclude that the defendants were deliberately indifferent to Hanson's serious medical needs. This becomes evident upon reviewing each Corizon Defendants' conduct in relation to Hanson's care, beginning with Dr. Dawson.

#### 1. Dr. Dawson

Dr. Dawson first became involved in Hanson's care in September 2010, when she reviewed the results of a prostate biopsy with him. *See Dawson Aff.* ¶¶ 9, 16. As noted above, the biopsy showed a cancerous prostate, and Dr. Dawson immediately submitted a consultation request for a follow-up with an outside urologist. *Id.* ¶ 16. Dr. Dawson then

ORDER - 9

followed up with Hanson in October, November, and December of 2010. During this time, Hanson saw multiple outside providers and took time to determine which course of treatment he preferred. There is no indication in the record that immediate, or even urgent, action was warranted.

In early December, Hanson told Dr. Dawson that although he had initially wanted radiation, he now wanted surgery. Within one day of this discussion, Dr. Dawson submitted a consultation request for a urologic surgical evaluation. As noted earlier, Hanson had that consultation on January 4, 2011 and then had surgery on January 31, 2011.

After his surgery, Dawson was briefly involved in Hanson's care during March and April 2011. During that time, she assessed Hanson, ordered tests (a urine culture), prescribed pain medications, and arranged for a follow-up visit with a urologist. *Dawson Aff.* ¶¶ 25-32.

    2.    **Dr. Lossman**

Dr. Lossman became involved in Hanson's care in December 2010, when he discussed Hanson's preferred treatment (surgery) with Dr. Dawson. *Lossman Aff.* ¶ 7. On January 28, 2011, Dr. Lossman admitted Hanson into the medical unit at ISCI. Hanson returned to the medical unit after his January 31, 2011 surgery, and remained there until February 15, 2011, at which time Hanson said he "'wanted to go home.'" *Lossman Aff.* ¶ 10 (quoting ISCI 79). Dr. Lossman discharged Hanson at that time, noting that his condition was good. During Hanson's stay in the medical unit, Dr.

Lossman assessed Hanson, prescribed various medications, including a prescription for Cialis and the use of a penis pump. Upon discharge, Dr. Lossman issued a bottom bunk memo for Hanson.

Dr. Lossman was also involved in responding to Hanson's complaints, made in the summer of 2011, about continued urinary difficulties. *See Lossman Aff.* ¶¶ 13-20. Following these complaints, various different medical personnel, including Dr. Lossman, P.A. Matt Valley, Dr. Song, and Dr. Waldmann assessed Hanson. Ultimately, Dr. Lossman submitted a consultation request for another procedure (a flexible cystoscopy) to rule out a bladder neck contracture. That procedure was performed on August 30, 2011. *Id.* ¶¶ 15-17. On September 21, 2011, Dr. Lossman wrote a consultation request for a follow-up appointment with Dr. Waldmann *Id.* ¶ 20. After that, Dr. Lossman was no longer directly involved in Hanson's care. *Lossman Aff.,* Dkt. 47-24, ¶ 18.

3. **Dr. Song**

Dr. Song was involved with Hanson's care for several months in 2011. She first became involved on January 28, 2011, when Hanson was transferred to the ISCI medical unit. She performed an inpatient history and physical. *Song Aff.* ¶ 7. Later, in April 2011, Dr. Song helped arrange for Hanson to have a private place to use his penis pump. *Song Aff.,* Dkt. 47-25, ¶ 9. During the summer of 2011, Dr. Song was also involved with Hanson's care related to his complaints that he was having complications urinating. In September 2011, Dr. Song was involved in helping Hanson receive some of his medications, which had been delayed for unknown reasons. *Song Aff.* ¶ 11-12. Dr. Song

also saw Hanson on at least two occasions in December 2011 related to ongoing, post-surgical care. Among other things, reviewed medication orders and submitted a consultation request for urodynamic testing, which was scheduled for January 10, 2012.

Reviewing all this evidence, the Court concludes that Hanson has failed to satisfy the essential elements of his Eighth Amendment claim – namely a showing of deliberate indifference and damages flowing from the alleged inadequate medical care. To be sure, the record reflects gaps in time between (1) the diagnosis of Hanson's prostate cancer, (2) the election of a course of treatment; and (3) the treatment itself. But nothing in the record shows that these gaps were unusual, or that treatment was needed more promptly than given, or that harm resulted from any delay. A mere delay in treatment, standing alone, does not constitute a violation of the Eighth Amendment. Rather, Hanson must show that he suffered harm as a result of the alleged delay. *See*, *e.g.*, *McGuckin*, 974 F.2d at 1060. Hanson has not done that. To the contrary, the record shows Hanson received ongoing medical treatment while he was incarcerated. And if medical personnel have been consistently responsive to Hanson's medical needs and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," then summary judgment is proper. *Toguchi v. Chung*, 391 F.3d at 1061. The Court will thus grant summary judgment in favor of the Corizon Defendants' on the Eighth Amendment claim.

### C. Defendant Rona Siegert

The Court will also grant summary judgment on the Eighth Amendment claim in

favor of defendant Rona Siegert. It appears that Hanson is alleging a supervisory claim against Hanson. This claim necessarily fails because Hanson has failed to establish a cognizable claim against of the other defendants. *See generally City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *Long v. City & County of Honolulu*, 511 F.3d 901, 907 (9th Cir. 2007); *Bias v. Moynihan*, 508 F.3d 1212, 1222–23 (9th Cir. 2007).

2. **State-Law Claims**

The Court will also grant summary judgment in favor of all remaining defendants on Hanson's state-law claims.

   A. **State Constitutional Claims**

Resolution of Hanson's federal constitutional claims necessarily resolves his alleged grievances brought under the state constitution. *See Memorandum Decision & Order,* Dkt. 46, at 10 (citing *State v. Sharpe*, 931 P.2d 1211 (Idaho 1997)). The Court will therefore grant summary judgment on Hanson's state constitutional claims.

   B. **Malpractice Claim**

The Court will also grant summary judgment on Hanson's malpractice claim. Hanson claims that defendants committed medical malpractice. *See Compl.* at 8 (alleging that "defendants and CMS and Corizon doctors committed malpractice with malicious intent to cause plaintiff unnecessary injury, pain, and suffering in the violation of the Idaho . . . constitution."). "To avoid summary judgment in a medical malpractice action a plaintiff must provide expert testimony that the defendant doctor, or other health care provider, negligently failed to meet the applicable standard of health care practice." *Hall*

*v. Rocky Mountain Emergency Physicians, LLC*, 312 P.3d 313, 316 (Idaho 2013) (citation and internal quotation marks omitted). Hanson has not come forward with any such evidence; indeed, as mentioned above, he has not even opposed this motion. The Court will therefore grant summary judgment on the malpractice claim.

## ORDER

**IT IS ORDERED that**

1. Defendants Scott Lossman, April Dawson, and Myung Song's Motion for Summary Judgment (Dkt. 47) is **GRANTED.**

2. Defendant Rona Siegert's Motion for Summary Judgment (Dkt. 53) is **GRANTED.**

DATED: March 31, 2015

B. Lynn Winmill
Chief Judge
United States District Court